UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



JOSEPH PAUL YOUNG,　　　　　*　　　CIV 11-4140-RAL
　　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　*
　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　*　　　OPINION AND ORDER
vs.　　　　　　　　　　　　*　　　DENYING MOTION TO
　　　　　　　　　　　　　　　*　　　VACATE, SET ASIDE, OR
UNITED STATES OR AMERICA　　　*　　　CORRECT SENTENCE
　　　　　　　　　　　　　　　*　　　UNDER 28 U.S.C. § 2255
　　　　Defendant.　　　　　　*

## I. INTRODUCTION

On October 7, 2008, Petitioner Joseph Paul Young ("Young") was indicted in the United

States District Court for the District of South Dakota on three counts of bank robbery in violation

of 18 U.S.C. § 2113(a). United States v. Young, CR-08-40151-RAL, Trial Doc. 1.[1] Young was

tried by a jury, convicted on all three counts, and sentenced to 216 months imprisonment on each

count to be served concurrently. Trial Doc. 71. The United States Court of Appeals for the

Eighth Circuit affirmed his convictions and sentence. United States v. Young, 644 F.3d 757,

759 (8th Cir. 2011).

Young has now filed a pro se motion to vacate, set aside, or correct his conviction and

sentence under 28 U.S.C. § 2255. Doc. 1. Young also filed a "Supplemental to Petitioner's 28

U.S.C. § 2255 'Ground 4,'" Doc. 6, that this Court construed as an amendment to Young's

petition. See Doc. 10; Doc.11. The Government responded in opposition to Young's petition.

Doc. 20. While the petition was pending, Young filed a Motion to Pose a Question, Doc. 24,

---

[1] Documents filed in Young's underlying criminal case, CR-08-40151-RAL, will be
referred to in citations with the preface "Trial Doc." followed by the document number.
Documents filed in this civil petition under 28 U.S.C. § 2255 will be referred to in citations with
the preface "Doc." followed by the document number.

requesting an update on the status of his petition. Young next filed a Motion for Appointment of Counsel. Doc. 25. For reasons stated below, Young's petition under § 2255 and his Motion for Appointment of Counsel are denied, and Young's Motion to Pose a Question thereby is moot.

## II. BACKGROUND

Young robbed three banks in South Dakota between August 13, 2007 and September 26, 2007. Young, 644 F.3d at 759. After these robberies in South Dakota in 2007, Young traveled to Charleston, West Virginia, and robbed more banks in August 2008. Trial Doc. 68. Young was arrested in his native Missouri, and sent to West Virginia for prosecution. Young also was suspected of committing two bank robberies in Minnesota and others in Kentucky. Trial Doc. 68. On October 7, 2008, while Young was in federal custody awaiting trial in West Virginia, a federal grand jury in South Dakota returned an indictment against Young for the three South Dakota bank robberies. Trial Doc. 1. Young pleaded guilty to the bank robbery in West Virginia and was sentenced to 240 months imprisonment on June 15, 2009. Trial Doc. 68. After being sentenced for his West Virginia conviction, Young was arrested in West Virginia on the South Dakota charges on June 29, 2009, transferred to South Dakota, and arraigned on August 11, 2009. Trial Doc. 3; Trial Doc. 8. Young subsequently was convicted in federal court in Minnesota on two counts of bank robbery and sentenced to 220 months imprisonment on each count to be served concurrently. See United States v. Young, 701 F.3d 1235, 1240 (8th Cir. 2012).

In the South Dakota federal case, Young was represented by Assistant Federal Public Defender Timothy Langley ("Langley"). Young's trial originally was scheduled for October 20, 2009. Trial Doc. 12. Langley sought four continuances. Trial Docs. 13, 17, 19, 31. The first continuance stemmed from Langley's need for additional time to investigate discovery that he

2

had received. Trial Doc. 13. The second and third continuances related to additional discovery Langley requested. The second continuance was sought because the Government had not yet furnished the additional discovery, Trial Doc. 17, while the third continuance was sought because Langley needed additional time to review the discovery once it was produced, Trial Doc. 19. Langley filed an affidavit stating that Young provided him oral continuing consent to file continuances at their initial visit. Doc. 15 at 2, 6. According to Langley, Young told him to take as much time as needed to prepare, and Langley asked for the first three continuances based on Young's oral consent. Doc. 15 at 2.

Langley sent a letter to Young on May 24, 2010, after Young asked Langley whether Young's Sixth Amendment right to a speedy trial was being violated by the continuances. Doc. 15 at 6. Langley recorded in the letter that Young had told him to take the time needed to prepare and that the continuances were needed because Langley had requested supplemental discovery. Doc. 15 at 6. Langley then cautioned Young that

> these charges against you are not going to go away by means of a legal hat trick. I am also telling you that I have acted in good faith based on my instructions from you as I understood them at the time. Your Speedy Trial Act rights have not been violated. Nor will reasonable adjustments in scheduling of your trial based on good cause even now cause your Speed[y] Trial Act rights to be violated. However, if at any time your Speedy Trial Act rights are actually violated, you can be sure that I will not miss the violation or allow the violation to pass unnoticed.

Doc. 15 at 6.

After these first three continuances, Young withdrew his consent to further continuances. Doc. 15 at 2. After Young withdrew his consent, Langley felt forced to file a fourth and final continuance motion, Trial Doc. 31, to accommodate the trial testimony of the defense's expert

witness and Langley's own trial schedule. Doc. 15 at 2; Trial Doc. 31. All motions for continuances Langley filed state that the defendant's consent and waiver of speedy trial rights form will be filed under separate cover, but no written consent form was filed. Trial Docs. 13, 17, 19, 31.

Young argues that Langley filed these motions for continuances against his will because Young never provided Langley oral continuing consent. Doc. 22 at 1-2. Young made three pro se filings while represented by Langley. The first pro se filing, Trial Doc. 21, was filed after the third continuance motion—timing consistent with Langley's affidavit as to when Young withdrew his consent. In this filing, Young requests new counsel for, among other reasons, Langley allegedly obtaining continuances after Young had told him not to do so. Trial Doc. 21. Young's second pro se filing was a Motion to Dismiss Indictment, Trial Doc. 23, that argued Langley's allegedly unauthorized continuances violated Young's Sixth Amendment right to a speedy trial, a claim restated in this case. The third was a motion requesting new counsel, Trial Doc. 27, in which Young attempted to have Langley replaced because Langley believed that it was in Young's best interests to secure a plea bargain.

Young's jury trial on the South Dakota bank robberies began on August 23, 2010. The Government's case was built in large part on eyewitness identifications by bank tellers of Young as the robber and Young's physical resemblance to the robber in the surveillance video that each robbed bank produced. Doc. 15. Langley's defense centered on the Government's lack of physical evidence against Young and arguments that the identifications were flawed. Doc. 15; Doc. 21 at 12.

On August 13, 2007, at about 10:34 a.m., Young robbed a Valley Bank location in Sioux

Falls, South Dakota. The bank robbery was captured on a video system at the bank. See Exs.[2] 1, 2A-C. Young approached a teller, announced to her that this is a bank robbery and demanded money. Young then demanded that the teller give him the big bills. Young had contact with a second Valley Bank teller during the robbery as well. Young wore an untucked plaid shirt and a baseball cap during the robbery. Exs. 1, 2A-C. When Young became a suspect one year later, the two tellers who had worked at Valley Bank separately were provided with a photographic line-up of six pictures and told that the bank robber may or may not be depicted among the photographs. One teller was unable to identify any of the people in the line-up as the suspect, while the other Valley Bank teller identified Young as the robber saying that she was eighty percent sure, although seeing Young in the courtroom during trial, that teller became one-hundred percent sure that Young was the man who robbed Valley Bank. See Ex. 3. In cross-examination, Langley brought out that the tellers had initially given varying descriptions of the bank robber's height, weight, and facial hair, that one teller never could identify Young as the robber, and that the other teller was less than certain that Young's picture was that of the man who had robbed the bank approximately a year earlier.

On August 14, 2007, over the noon hour, Young robbed a Wells Fargo Bank branch location in Mitchell, South Dakota. Surveillance video from the interior and the exterior captured images of the robbery. See Exs. 4, 5A-M. Young approached a teller and said "give me all your money." The teller laughed as she originally thought it a joke, so Young said "You think I'm joking; I'm not joking." Young then pulled at his plaid shirt with his hand toward his pocket in a gesture captured on video surveillance as if to suggest that he had a gun. See Exs.

---

[2] Trial exhibits will be referred to by "Ex." or "Exs." followed by the exhibit number or numbers.

4, 5E. After the teller gave Young money, Young told her to give him bills from her second drawer. Young then demanded that a nearby teller give him money from her drawers, and she did so. The first teller, who was the more experienced one, studied Young's face during the robbery. Another bank employee and a bank customer saw Young speed away from the bank in a blue car, possibly a Chevrolet or Pontiac, and an outside camera captured images of that car at a distance. Exs. 5A-C. The surveillance video comported with the teller's recollections that Young wore a plaid untucked shirt and a baseball cap and was not clean shaven. See, e.g., Ex. 5H. The Wells Fargo video was of a better quality than the grainy black and white surveillance images from Valley Bank's system. Plainly, the same man committed both robberies, and the images from Wells Fargo look to be Young. Both Wells Fargo tellers, one year after the robbery, separately picked Young out of a photographic line-up, Exs. 6-7, with one teller being one hundred percent certain both then and at trial that Young was the robber.

In cross-examination of the witnesses of the Wells Fargo bank robbery, Langley established that one witness claimed the bank robber's car had Minnesota license plates and possibly was an Olds Achieva, when in fact Young's vehicle had Missouri license plates and was a blue Chevrolet Cavalier. Langley established that law enforcement at one point stopped a blue Toyota in connection with investigating the robbery and that a different person had surfaced as a suspect earlier. Langley further explored how the descriptions of the robber's height, weight, and facial hair varied between the two tellers. Langley also questioned whether the officer conducting the photographic lineup had tainted the reliability of the identifications.

On September 26, 2007, again over the noon hour, Young robbed the West Maple Street branch of First National Bank in Sioux Falls. Young approached the teller and, in an aggressive tone and using an expletive, demanded all of the teller's money. Young again demanded the

6

"large bills." Young wore the same untucked plaid shirt, but this time had a different baseball cap on—a yellow cap with a maroon "M" insignia that appeared to be a University of Minnesota baseball cap. Exs. 8, 9E. Another bank employee, upon learning of the robbery, looked outside the bank and saw Young get into a dark blue car. An employee of a nearby Subway restaurant happened to see Young walk into the bank and then shortly afterwards saw a blue car go around him really fast. The Subway employee believed the car to be a blue Chevrolet Cavalier and identified the driver as a male wearing a cap and a plaid flannel shirt. Security cameras from the bank and its ATM captured clear images of Young robbing the bank and of Young's blue car. Exs. 8, 9A-B. An expert in the automobile industry identified the blue car captured in the security video images as most probably a 2005 Chevrolet Cavalier. The teller, both when presented with the photographic lineup and at trial, identified Young as the bank robber. Ex. 10.

This Court permitted limited testimony about two bank robberies in Minnesota—one on September 18, 2007, in Maplewood, and one on September 25, 2007, in Fridley. Images from both robberies clearly showed Young—wearing his plaid untucked shirt and University of Minnesota baseball cap—robbing those banks. Exs. 17, 18A-J, 19, 20A-C. Those two bank robberies occurred between the time of the second bank robbery in South Dakota, where Young had worn a darker colored baseball cap, and the final bank robbery in South Dakota, where Young wore the yellow University of Minnesota baseball cap with the maroon "M." Langley objected to the introduction of evidence concerning the Minnesota bank robberies, but this Court permitted, and the United States Court of Appeals for the Eighth Circuit affirmed, introduction of the evidence of these very similar bank robberies committed close in time in the same manner with the same car present and evidently by the same person. Young, 644 F.3d at 759.

Young's identity as the bank robber became known after his West Virginia bank

robberies because his image, and that of the black 2008 Chevrolet Silverado that he then owned and was driving, were captured by bank surveillance. After eluding the FBI and police in a high speed vehicle chase, Young was arrested in his home state of Missouri. After his arrest, Young announced apart from any questioning that if the FBI could prove it, he would confess to any bank robbery he had committed. Young told the FBI that he would take responsibility as a man for whatever punishment he received.

Upon executing a search warrant at Young's residence, law enforcement found, among other things, a 2005 blue Chevrolet Cavalier and a University of Minnesota baseball cap identical to the hat that appears on Young's head on the video surveillance of the third Sioux Falls bank robbery and the two Minnesota bank robberies. Title records showed that Young purchased the 2005 blue Chevrolet Cavalier on April 29, 2006, and sold the car to his sister in 2009. Further investigation revealed that Young had used his credit card in South Dakota to buy gasoline on August 13, 2007, the date of the first South Dakota bank robbery.

Throughout the Government's case, Langley objected where appropriate and cross-examined in a manner that called into question whether identifications of Young made more than a year after the South Dakota bank robberies were reliable. Langley retained and called as an expert witness Dr. Ray Malpaas, a professor of psychology with a Ph.D. in social psychology and an expertise in the science of memory and identification. Through Dr. Malpaas, Langley introduced evidence that the brow and forehead are critical to a person's recognition of another's face and that the robber's wearing of a cap during all the robberies reduced the ability of tellers to identify the robber. Langley through Dr. Malpaas also called into question whether two of the photographs in the six-person photographic line-ups were so different from Young to make the actual choice a one-in-four rather than one-in-six proposition. Langley, again using Dr. Malpaas,

8

suggested that the South Dakota tellers' identifications a year after the robberies using the photographic line-ups were not reliable. Langley called other witnesses to present evidence that there had been other suspects during the one year before Young's identity became known to South Dakota law enforcement.

On August 25, 2010, the jury convicted Young on all three counts of bank robbery. Doc. 1 at 1; Trial Doc. 68. This Court sentenced Young to 216 months imprisonment on each count to run concurrently and with 36 months of that sentence to run concurrent with the 20 year federal sentence he was serving for his West Virginia conviction. Doc. 1 at 1. The Eighth Circuit affirmed Young's convictions and sentence. Doc. 1 at 2; Young, 644 F.3d at 759.

Young's petition contains four grounds for relief. Ground One claims ineffective assistance of counsel for failing to preserve Young's Sixth Amendment right to a speedy trial and claims that Langley had a conflict of interest because, at one point, Langley recommended to Young that he enter into a plea agreement. Ground Two claims ineffective assistance of counsel relating to certain evidentiary issues. Ground Three claims ineffective assistance of counsel for failing to investigate and object to alleged witness perjury and an alleged Fifth Amendment violation by law enforcement. Ground Four claims ineffective assistance of counsel for failing to object to the Government's admission of the factual basis statement from Young's West Virginia bank robbery plea agreement with the U.S. Attorney's Office for the District of West Virginia ("USAO-WV") and that the U.S. Attorney's Office for the District of South Dakota ("USAO-SD") breached the plea agreement by introducing into evidence the factual basis statement from Young's agreement with the USAO-WV in violation of the plea agreement's "use immunity" clause. Doc. 1; Doc. 6.

## III. DISCUSSION

Young filed his petition under § 2255 on October 3, 2011. Doc. 1. Young filed two additional motions while his petition under § 2255 has been pending. On March 25, 2013, Young filed a Motion to Pose a Question, Doc. 24, essentially asking this Court about the status of his petition. On May 28, 2013, Young filed a Motion for Appointment of Counsel, Doc. 25. This Court will address the latter two motions first, before turning to Young's petition under § 2255.

### A. Motion to Pose a Question

Young's Motion to Pose a Question, Doc. 24, becomes moot based on this Court's resolution of his petition under § 2255.

### B. Motion for the Appointment of Counsel

Prisoners do not have a constitutional right to counsel for a collateral attack on their sentence. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); see also United States v. Craycraft, 167 F.3d 451, 455 (8th Cir. 1999) ("[T]here is no general right to counsel in post-conviction habeas proceedings for criminal defendants."). The district court, however, "may appoint counsel for a habeas petitioner when 'the interests of justice so require.'" Abdullah v. Norris, 18 F.3d 571, 573 (8th Cir. 1994) (quoting 18 U.S.C. § 3006A(a)(2)(B)). The interests of justice require appointment of counsel when the district court holds an evidentiary hearing on the petition. Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994). If no evidentiary hearing is necessary, the appointment is at the discretion of the district court. Id. "In exercising its discretion, the district court should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors." Id.; see also Abdullah, 18 F.3d at 573 ("If the petitioner has

presented a nonfrivolous claim, the district court should then determine whether, given the particular circumstances of the case, the appointment of counsel would benefit the petitioner and the court to such an extent that 'the interests of justice so require' it.") (quoting 18 U.S.C. § 3006A(a)(2)); United States v. Arcoren, 633 F. Supp. 2d 752, 757 (D.S.D. 2009).

Because an evidentiary hearing is not needed, see infra Part III.C, the appointment is discretionary. Applying these factors, the interests of justice do not require the appointment of counsel. While some of Young's allegations are somewhat involved, most are legally and factually straightforward. The majority of Young's claims allege ineffective assistance of counsel, which federal courts routinely handle in § 2255 petitions. See Abdullah, 18 F.3d at 573 (noting that "federal courts are quite familiar" with ineffective assistance of counsel issues). Young's remaining claims—a Sixth Amendment violation and an allegation that a previous plea agreement was breached—are less common, but not so legally or factually complex that Young was not able to investigate and present his claim to this Court. In fact, Young's briefing was more helpful than that of many pro se habeas petitioners. Young's motion contains no allegations that he needed counsel to prepare his petition. The timing of the motion also supports the fact that Young did not need assistance investigating and preparing his filings; he did not move for the appointment of counsel until after all the responsive pleadings were completed and this Court had begun its analysis. Thus, the interests of justice do not require the appointment of counsel.

## C. Evidentiary Hearing

"A petitioner's allegations must be accepted as true and a hearing should be held unless they are contradicted by the record, inherently incredible, merely conclusions, or would not entitle the petitioner to relief." Garcia v. United States, 679 F.3d 1013, 1014 (8th Cir. 2012). If

the court "'can determine from the motion and the supporting record in the case that [Young] is not entitled to § 2255 relief, then no hearing . . . is . . . required.'" Winters v. United States, 12-1992, 2013 WL 2927208, at *4 (8th Cir. June 17, 2013) (quoting Saunders v. United States, 236 F.3d 950, 952 (8th Cir. 2001)). Young's claims can be resolved on the record and he is not entitled to relief.

## D. Ineffective Assistance of Counsel Claims in Grounds One through Four

The first four grounds for relief allege Young's trial counsel, Timothy Langley, provided ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel the petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To meet this two-pronged standard, the petitioner must show that "(1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Ledezma-Rodriguez, 423 F.3d 830, 836 (8th Cir. 2005). The petitioner must "overcom[e] the strong presumption that defense counsel's representation fell 'within the wide range of reasonable professional assistance.'" Delgado v. United States, 162 F.3d 981, 982 (8th Cir. 1998) (quoting Strickland, 466 U.S. at 689); see also DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000) (noting that a petitioner "faces a heavy burden to establish ineffective assistance of counsel pursuant to section 2255") (internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (citing Strickland, 466 U.S. at 690); see also English v. United States, 998 F.2d 609, 613 (8th Cir. 1993) (holding that counsel's "reasonable trial strategy cannot rise to the level of

ineffective assistance of counsel"). Because the failure to establish prejudice can be dispositive, a court need not address the reasonableness prong if prejudice cannot be established. United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996). This Court will address all of Young's ineffective assistance of counsel claims in this section.

### 1. Ground One's Ineffective Assistance Claims

In Ground One, Young argues that Langley was constitutionally ineffective for seeking continuances against his will that resulted in a violation of his Sixth Amendment right to a speedy trial. Young is not entitled to collateral relief on this claim.

The Sixth Amendment's right to a speedy trial exists to protect the defendant's liberty interest and to minimize a defendant's possible lengthy pretrial incarceration. United States v. Gouveia, 467 U.S. 180, 189-90 (1984). Unlike other procedural rights, the right to a speedy trial is amorphous and "necessitates a functional analysis of the right in the particular context of the case." Barker v. Wingo, 407 U.S. 514, 521-22 (1972) (internal citations and quotation marks omitted). A court evaluating a Sixth Amendment speedy trial claim employs a four factor balancing test considering "1) the length of delay; 2) the reason for delay; 3) whether the defendant asserted the right to a speedy trial; and 4) whether the defendant suffered any prejudice" to determine if the right was violated. United States v. Jeanetta, 533 F.3d 651, 656 (8th Cir. 2008) (citing Barker, 407 U.S. at 530).

The first factor requires a dual enquiry. United States v. Walker, 92 F.3d 714, 717 (8th Cir. 1996) (citing Doggett v. United States, 505 U.S. 647, 651 (1992)). First, the defendant must establish that the length of the delay was long enough to cross "the threshold dividing ordinary from presumptively prejudicial delay" and trigger an analysis of the remaining factors. Doggett, 505 U.S. at 651-52 (internal quotation marks omitted); see also United States v.

13

Williams, 557 F.3d 943, 948 (8th Cir. 2009) ("We consider the length of delay first because it is a triggering mechanism.") (internal quotation marks omitted). "The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." Williams, 557 F.3d at 948 (quotation marks omitted). A delay between indictment and the start of trial of at least a year crosses the threshold and triggers application of the remaining factors. United States v. Brown, 325 F.3d 1032, 1034 (8th Cir. 2003). Here, the delay between Young's indictment and trial was around 22 months. Compare Trial Doc. 1 (noting indictment occurred on October 7, 2008) with Trial Doc. 32 (noting trial begins August 23, 2010). This delay triggers the remaining factors. Because this Court must then consider the length of delay as an independent factor, Walker, 92 F.3d at 717, this factor weighs in Young's favor. The full extent of the delay and its prejudicial effect will be addressed under later factors. See Doggett, 505 U.S. at 651 (noting that while this factor is independent, the length of the delay and the prejudicial effect can be addressed within the context of other factors).

Under the second factor, the court must consider both the reasons for the delay and whether the government or the defendant is more to blame for that delay. United States v. Summage, 575 F.3d 865, 876 (8th Cir. 2009). Courts give different weights to different reasons for delay. United States v. Erenas-Luna, 560 F.3d 772, 777 (8th Cir. 2009). This factor often focuses on whether the Government intentionally caused the delay, which weighs heavily against the Government, or whether the Government caused the delay unintentionally, such as through failing to try and locate an indicted defendant, which weighs less heavily against the Government. See Doggett, 505 U.S. at 657; Erenas-Luna, 560 F.3d 777-78. However, a delay caused by the defendant weighs against him. Williams, 557 F.3d at 949.

14

Over ten months of Young's 22-month delay is attributable to Young's prosecution in West Virginia, which Young brought upon himself by his pre-indictment decision to rob banks in West Virginia. Continuances caused the remaining delay. Young does not allege that the Government is at fault, and, in fact, the Government bears no blame; it pursued Young once he became a suspect, indicted him, and, after his prosecution and sentencing in West Virginia concluded, transported him to this District. Langley's affidavit and his letter to Young support that Young told Langley to take the time he needed to prepare, that the continuances were needed to allow Langley to gather and analyze discovery, and that Langley was mindful of Young's Sixth Amendment right to a trial without delay. Doc. 15 at 6-8. Young withdrew his authorization for continuances prior to the final continuance that Langley sought, but Langley had good cause for seeking that continuance because a material defense witness could not attend the trial and Langley's calendar necessitated such a continuance. Young is "more to blame" under this second factor. See Summage, 575 F.3d at 865.

The third factor inquires whether the movant asserted his right to a speedy trial. A defendant's "'assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.'" Williams, 557 F.3d at 949 (quoting Barker, 407 U.S. at 531-32). Once he was arrested on the charges for the South Dakota bank robberies, Young filed "Defendant's Invocation of Rights Under the Fifth and Sixth Amendments," Trial Doc. 4, invoking his "right to remain silent and his right to counsel," but not his right to a speedy trial. Young first asserted his speedy trial right in an ex parte motion filed after the third of the four motions for continuances that Langley sought and received. Trial Doc. 21. This timing is consistent with Langley's affidavit stating that Young withdrew his consent after the third continuance. Thus, this factor weighs in Young's favor with respect to

15

at least the final motion for continuance.

The fourth factor requiring an examination of the prejudice to the defendant from the delay weighs heavily against Young. The degree of prejudice is determined in light of the three interests the speedy trial right is intended to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the defendant's anxiety and concern; and (3) limiting the possibility of impairment to the defense. Barker, 407 U.S. at 532; see also Erenas-Luna, 560 F.3d at 778. Of those three interests, prejudice causing impairment of the defense is the most serious. Erenas-Luna, 560 F.3d at 778. The degree of prejudice required depends on the circumstances. Id. If the Government exercises reasonable diligence in its pursuit of the defendant, a showing of actual prejudice is required. United States v. Brown, 325 F.3d 1032, 1035 (8th Cir. 2003) (holding actual prejudice is required if the Government was not negligent in locating the defendant); see also Williams, 557 F.3d at 950 ("Negligence by the government requires toleration by the courts that 'varies inversely with its protractedness . . . and its consequent threat to the fairness of the accused's trial.'") (quoting Doggett, 505 U.S. at 657).

Young cannot show prejudice, let alone actual prejudice, from this delay. Young was not subjected to oppressive pretrial incarceration or anxiety because he was, and still is, serving a 20 year federal sentence for a bank robbery in West Virginia. The delay did not limit his defense. Young, for example, has not even attempted to identify witnesses helpful to his defense who became unavailable due to the delay. See, e.g., Erenas-Luna, 560 F.3d at 779 ("As to actual prejudice, we agree with the district court that [petitioner's] vague claims regarding witness memory loss and lost opportunities to cooperate with the government are insufficient, without more, to satisfy his burden."). Indeed, the additional delay benefitted his defense by allowing Young and Langley to receive all materials to challenge the Government's eyewitness

identifications and surveillance video as unreliable. The fourth continuance, to which Young did not consent but Langley sought anyway, benefitted Young by ensuring that his expert witness could attend the trial. Thus, Young suffered no prejudice from the continuances and delay.

The delay in this case did not impede Young's defense nor did it threaten to deprive him of a fair trial. Although Young did assert his right to a speedy trial, the delay is more attributable to Young than to the Government. As a matter of law, Young cannot prevail either on the reasonableness or on the prejudice prong of his claim of ineffective assistance of counsel due to a violation of his rights to a trial without undue delay under the Sixth Amendment. See Marcusse v. United States, 785 F. Supp. 2d 654, 671 (W.D. Mich. 2011) ("Therefore, because there is no error of a constitutional magnitude, and because there was no error resulting in a complete miscarriage of justice nor so egregious to amount to a violation of due process, Movant's argument that her right to a speedy trial was violated is without merit.").

Young next alleges that he was denied constitutionally effective counsel because Langley had a conflict of interest. Young alleges Langley had an impermissible conflict of interest because Langley advised that, after considering the evidence against Young, it would be in his best interest to secure a plea bargain. Doc. 22 at 3; Doc. 1 at 8. Young does not plead any facts showing that Langley's performance was affected adversely. Young states only "How can a defense counsel adequately fend for a client when counsels [sic] own personal interest is to plead guilt?" Doc. 1 at 8.

Young raised this issue before the trial court. In his second ex parte motion requesting new counsel in his underlying criminal case, Doc. 27, Young asked for new counsel because Langley repeatedly tried to convince Young to plead guilty. Magistrate Judge John Simko denied Young's motion stating:

> Mr. Young possesses complete control over the decision to plead guilty or go to trial. His lawyer can make recommendations, but the decision whether to plead guilty or go to trial belongs to Mr. Young. His lawyer's duty is to tell Mr. Young what his chances of acquittal versus conviction are. That is obviously what his lawyer has tried to explain. Lawyers need to tell clients what they need to hear, not what they want to hear.

Trial Doc. 28.

A defendant's claim that his counsel was constitutionally ineffective based on a conflict of interest is considered under different theories depending on the circumstances. Noe v. United States, 601 F.3d 784, 789 (8th Cir. 2010). Typically, a defendant raising an ineffective assistance claim must establish both prongs of the test outlined in Strickland. Morelos v. United States, 709 F.3d 1246, 1251 (8th Cir. 2013). A defendant is entitled to automatic reversal "only where defense counsel is forced to represent co-defendants over his timely objection, unless the trial court has determined that there is no conflict." Mickens v. Taylor, 535 U.S. 162, 168 (2002) (citing Holloway v. Arkansas, 435 U.S. 475, 488 (1978)). Next, under Cuyler v. Sullivan, 446 U.S. 335 (1980), a court will assume the prejudice prong is established if the petitioner can "demonstrate that 'an actual conflict of interest adversely affected his lawyer's performance.'" Johnson v. Norris, 207 F.3d 515, 519 (8th Cir. 2000) (quoting Sullivan, 446 U.S. at 348); see also Mickens, 535 U.S. at 167-70 (2002) (explaining that when no one objects to a counsel's multiple representation, the defendant alleging a Sixth Amendment violation based on a conflict must show that the conflict "affected the adequacy of the representation" to be within Sullivan). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens, 535 U.S. at 172 n.5. The effect of this conflict must be "actual and demonstrable" and force the attorney to choose either to engage or not engage in particular conduct. Noe, 601 F.3d at 790. The defendant must make this showing by identifying

18

"a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Id. (internal quotation marks and citations omitted).

Here, although Young did raise Langley's alleged conflict of interest, Young is not entitled to relief. Young does not allege that Langley undertook multiple concurrent representations over his own objection. In fact, what Young alleges is not a conflict at all. Counsel has an ethical duty to make realistic determinations and honest recommendations about a client's prospect at trial. The client is free to disregard those recommendations, as Young did here. Counsel does not become entangled in a conflict of interest every time his client chooses a different path than the one counsel recommends. Young does not provide any support for the allegation that Langley's advice to try and secure a plea agreement affected Langley's strategy or performance. Indeed, Langley provided as good a defense as any trial lawyer could be expected to provide Young under the circumstances of the overwhelming evidence of Young's guilt.

Also, Young has not met either prong under Strickland, and prejudice cannot be presumed from this sort of alleged conflict. As for the performance prong, Langley had a duty to make an honest recommendation about Young's prospects at trial. In view of the overwhelming evidence of Young's guilt, Langley's advice regarding the merit of a plea agreement was good advice that Young, as is his right, chose not to follow. Young does not allege joint representation, and prejudice cannot be presumed under Sullivan because there is no actual conflict. Nor is there any evidence that Langley's initial advice to Young to seek a plea agreement led to deficient performance by Langley at trial. Young is not entitled to any relief

19

for his claim that Langley had a conflict of interest.

## 2. Ground Two's Ineffective Assistance Claims

In Ground Two, Young alleges three constitutional deficiencies by Langley. First, Young contends Langley erred by telling the jury in opening statements that he would produce evidence of shoeprints from the crime scene that did not match Young's shoes. Doc. 1 at 9-10. Young withdrew this ground in his responsive filing and it will not be considered. See Doc. 22 at 4 ("Now, after reading Mr. Langley's affidavit, I will accept his explanation to this one particular issue and I waive any further challenges regarding the shoeprint evidence.")

Second, Young alleges that Langley concealed or omitted exculpatory DNA evidence discovered in connection with a bank robbery in Minnesota of which Young was convicted in a separate trial after he was sentenced for the South Dakota robberies. Doc. 1 at 11. When compared with Young's known sample, the DNA evidence discovered in the Minnesota robbery showed that Young could not be excluded as a suspect. Doc. 1 at 11. The DNA evidence could exclude 67% of the population, but not Young. Young argues that Langley erred in not admitting this evidence. Doc. 1 at 11. However, Langley's strategic decision not to introduce the DNA evidence was reasonable. See Rice, 449 F.3d at 897 (holding that well informed strategic choices made by counsel are "virtually unchallengeable"). The evidence would have done more to implicate Young than exculpate him because the evidence did not rule out Young while it did rule out 67% of the population. The forensic scientist's DNA report went so far as to state that Young's "DNA profile is consistent with the DNA mixture profile." Doc. 1-3 at 3. Langley repeatedly argued that the Government could not produce physical evidence, including DNA evidence, that tied Young to the robberies in South Dakota. Thus, Langley's decision not

20

to introduce the DNA evidence regarding a Minnesota bank robbery was quite reasonable and certainly not prejudicial to Young.

Young's third evidentiary challenge in Ground Two is a bit unclear. Young contends either that Langley failed to investigate certain alibi evidence, or that Langley investigated and then concealed alibi evidence. Young contends that there is evidence that a gambling player card that was issued to Young was being used around the time of the Minnesota bank robberies at a casino in North Kansas City, Missouri. Doc. 1 at 9-13; Doc. 22-1 at 16. Young however asserts no alibi evidence or other exculpatory evidence to suggest that he did not commit the three South Dakota bank robberies for which he was convicted and sentenced. His conviction of the two Minnesota bank robberies occurred separately. This Court permitted introduction of evidence of the two Minnesota bank robberies that occurred between the second and third South Dakota bank robberies committed by Young; the same person committed those robberies in the same manner, and indeed it was Young whose image was captured each time on surveillance cameras and who was identified as the bank robber independently by five of the six South Dakota tellers. Young's car was seen and appeared on surveillance at two of the three South Dakota bank robberies. Under a failure to investigate claim, a counsel's performance is reasonable and not deficient if he performed an adequate investigation of the facts, considered viable theories, and developed evidence to support those theories. Lyons v. Luebbers, 403 F.3d 585, 594 (8th Cir. 2005). The record established that Langley did so, and the separate conviction of Young for the Minnesota bank robberies apart from this case points to the lack of any credible alibi evidence to exculpate Young for the Minnesota bank robberies. See Young, 701 F.3d at 1240.

### 3. Ground Three's Ineffective Assistance Claims

21

Ground Three alleges two instances of ineffective assistance of counsel through Langley's failure to investigate. Again, a failure to investigate claim will fail if counsel investigated the facts, considered viable theories, and developed evidence to support those theories. Lyons, 403 F.3d at 594. Young first alleges that Langley failed to investigate alleged perjury by FBI Agent David Burlow ("Burlow"). Young contends that Burlow said he was assisted at the traffic stop that led to Young's arrest by Rogersville, Missouri Police Officer Tim Kitta ("Kitta"). Doc. 1 at 15-16. Kitta stated that Burlow was already executing the traffic stop when Kitta arrived at the scene. Doc. 1 at 15-16. Young alleges Langley's failure to focus on this discrepancy rises to the level of unconstitutional ineffective assistance.

Langley's refusal to dwell on a minor inconsistency as to the timing and location of an officer providing backup at Young's traffic stop—from which Young ultimately fled—was reasonable and not prejudicial. Langley, in his affidavit, stated that Burlow "was an experienced, engaging witness with a prejudicial story to tell about Mr. Young's arrest.[3] My goal was to get him out of the courtroom as quickly as possible." Doc. 15 at 3. Langley investigated the reports and determined that cross-examining Burlow by focusing on a peripheral, immaterial detail regarding a traffic stop from which Young fled would do Young more harm than good. Moreover, failing to point out this minor discrepancy had no effect on the result of the trial. See Lyons, 403 F.3d at 594 (noting that prejudice exists only if an error caused the proceeding's result to have been different).

Young next argues that Langley failed to investigate an alleged Miranda violation. After

---

[3] Langley's assessment of Agent Burlow and his testimony comports with this Court's observations at trial.

his arrest, Young was taken to the Greene County Jail in Springfield, Missouri, where, Young alleges, Burlow questioned him without providing warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Doc. 1 at 17-18. Langley investigated Young's claim of a Miranda violation. Doc. 15 at 3. Langley discovered that after Young had been arrested and placed in custody, he was not read his Miranda rights, but Young voluntarily made a statement to the effect of "If you prove to me that I've robbed a bank anywhere in this country, I'll admit it." Doc. 15 at 3. Langley chose not to move to suppress the statement because the statement was not in response to interrogation nor was it particularly incriminating. Doc. 15 at 3. After all, as became clear at trial, Young admitted to bank robbery in West Virginia, but was denying having robbed banks in South Dakota or Minnesota.

Langley's investigation and decision not to move to suppress the statement was reasonable and no prejudice resulted. The statement was not likely subject to suppression because it was made outside formal interrogation. See, e.g., United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (holding that Miranda requires warnings when "a suspect is (1) interrogated (2) while in custody"). And no prejudice resulted from its inclusion because it was not highly probative of Young's guilt as to the bank robberies in South Dakota. The statement's inclusion, in short, did not cause the result of the proceeding to be different in light of the overwhelming evidence against Young.

### 4. Ground Four's Ineffective Assistance Claim

The claims in Ground Four of Young's § 2255 motion relate to the Government's introduction of the factual basis statement from Young's plea agreement with the USAO-WV at his trial in South Dakota. See Doc. 1 at 11. Young argues that Langley's failure to object to

23

its admission was constitutionally unreasonable. Langley stated that introduction of the West Virginia plea agreement was helpful to his theory of the case. Doc. 15 at 3-4. By allowing the Government to introduce the fact that Young plead guilty to the West Virginia charge, Langley could show the jury that Young only became a suspect a year after the South Dakota bank robberies and after his confession in West Virginia. Doc. 15 at 3-4. Also Langley hoped to show that when Young was guilty of other bank robberies, he took responsibility and plead guilty, Doc. 15 at 3-4, and thus Young's desire to fight the South Dakota charges suggested his innocence. Doc. 15 at 3-4.

As noted above, counsel's strategic "choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Rice, 449 F.3d at 897. Langley made a strategic decision that the plea agreement's admission was consistent with his theory of the defense—that when Young actually committed a bank robbery and was caught, Young would admit it. Thus, his choice not to challenge the factual basis statement's admission was reasonable. Even if Langley's choice was not reasonable, Young did not suffer prejudice because the underlying facts from this conviction were admissible pursuant to Rule 404(b) of the Federal Rules of Evidence to show identity between the similar crimes. See Young, 644 F.3d at 760; see also United States v. Almendares, 397 F.3d 653, 662 (8th Cir. 2005) ("Under Rule 404(b), evidence of a prior crime, though inadmissible to show that a person acted in conformity with the prior act, may be admissible for other purposes, such as "proof of . . . identity . . . .") (quoting Fed. R. Evid. 404(b)).

### E. Ground Four's Prosecutorial Misconduct Claim

Young next argues that the Government breached its plea agreement with him by

admitting the factual basis statement from his West Virginia plea agreement at trial in South

Dakota. Doc. 1 at 20; Doc. 22 at 7. The Government argues that because Young failed to

raise this claim, which the Government argues is akin to prosecutorial misconduct, Young

procedurally defaulted this argument.[4]

---

[4] The Government also argued that the USAO-SD did not breach the plea agreement
Young entered into with the USAO-WV because the USAO-SD was not bound by the plea
agreement entered into between Young and the USAO-WV. The United States Court of Appeals
for the Eighth Circuit has addressed this issue holding that U.S. Attorneys make promises on
"behalf of the United States government as a whole,"and "unless a plea agreement uses specific
language that limits the agents bound by the promise, ambiguities regarding the agencies bound
by the agreement are to be interpreted to bind the agency at issue." Margalli-Olvera v. INS, 43
F.3d 345, 353 (8th Cir. 1994) (holding a plea agreement made by an Assistant U.S. Attorney
using the term "United States" bound entire United States government). Some circuit courts
addressing whether a U.S. Attorney's Office may bind other U.S. Attorney's Offices, or the
closely related issue of binding other agencies within the Justice Department, have reached
differing conclusions based on what language is used in the plea agreement. See United States v.
Annabi, 771 F.2d 670, 672 (2nd Cir. 1985) ("A plea agreement binds only the office of the
United States Attorney for the district in which the plea is entered unless it affirmatively appears
that the agreement contemplates a broader restriction."); United States v. Rourke, 74 F.3d 802,
807 n.5 (7th Cir. 1996) (noting that the court's holding is "consistent with the Second Circuit
which has held that '[a] plea agreement binds only the officer of the United States Attorney for
the district in which the plea is entered unless it affirmatively appears that the agreement
contemplates a broader restriction'") (quoting Annabi, 771 F.2d at 672). For example, in United
States v. Irvin, No. 4:05CR0005401JLH, 2009 WL 88537 (E.D. Ark. Jan. 13, 2009), the plea
agreement did not bind other Government agencies because the agreement stated that it "is
binding only upon the United States Attorney's Office for the Eastern District of Arkansas" and
that it did not bind any other U.S. Attorney or any other prosecuting agency. See id. at *3-4. Yet,
"the weight of authority appears to favor recognizing the actual authority of a U.S. Attorney's
Office in one district to bind its counterpart in another district in certain situations." United
States v. Crobarger, 158 F. App'x 100, 105-06 (10th Cir. 2005) (acknowledging that "[w]here
courts have squarely considered the question of the actual authority of a U.S. Attorney's Office to
bind the U.S. Attorney's Office of another district through a plea agreement, they have held that
such authority exists" before resolving case on narrower grounds); see also United States v.
Gebbie, 294 F.3d 540, 550 (3rd Cir. 2002) ("[W]hen a United States Attorney negotiates and
contracts on behalf of 'the United States' or 'the Government' in a plea agreement for specific
crimes, that attorney speaks for and binds all of his or her fellow United States Attorneys with
respect to those same crimes and those same defendants."); Margalli-Olvera, 43 F.3d at 353
(holding one Assistant United States Attorney may bind another United States Attorney's Office
and other agencies within the government); United States v. Harvey, 791 F.2d 294, 303 (4th Cir.

Doc. 21 at 12-13.

Young did not raise this claim at trial or on appeal. When a claim is not raised on direct appeal, that claim is procedurally defaulted unless the defendant demonstrates (1) cause and actual prejudice, or (2) actual innocence. Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005). Young can make no showing of actual innocence. Therefore, he must show cause and actual prejudice to defeat procedural default.

"Ineffective assistance of appellate counsel may constitute cause and prejudice to overcome procedural default." Becht, 403 F.3d at 545 (citing Boysiewick v. Schriro, 179 F.3d 616, 619 (8th Cir. 1999)). Thus, to proceed on his breach of the plea agreement or prosecutorial misconduct claim, Young must show that in failing to raise the breach of the plea agreement

---

1986) ("We hold instead that it must be interpreted to prevent further prosecutions for such offenses anywhere and by any agency of Government."). In Gebbie, for example, the United States Court of Appeals for the Third Circuit held that a plea agreement made between the "United States" and the defendant in one district bound a U.S. Attorney's Office in another district. 294 F.3d at 550. Here, Young's plea agreement with the USAO-WV states that it is made between "the United States and Mr. Young." Doc. 1-8 at 2, 6, 10. Such expansive language would appear to bind USAO-SD to the promises contained in Young's plea agreement with USAO-WV. The Government cites to the plea agreement's so-called "integration clause" as support for the proposition that the plea agreement bound only the USAO-WV. Doc. 21 at 14. The clause states that the plea agreement is the "entire agreement between the United States and Mr. Young in this matter" and that there are no other agreements about "pending or future charges against Mr. Young in any Court other than the United States District Court for the District of West Virginia." Doc. 1-8 at 10. An integration clause typically prevents a defendant who entered into a plea agreement from subsequently asserting that the government made him additional promises different than those outlined in the plea agreement. United States v. Leach, 562 F.3d 930, 935-36 (8th Cir. 2009). The integration clause does not alter the fact that Young's agreement was between the United States and Mr. Young. Indeed a plea agreement's ambiguities are construed against the government and "ambiguities regarding the agencies bound by the agreement are to be interpreted to bind the agency at issue." Margalli-Olvera, 43 F.3d at 353. Thus, it appears the USAO-SD was bound by the plea agreement's promises made by USAO-WV, including not to use information gathered from Young in exchange for the plea, including the factual basis statement, in further prosecutions against him. Ultimately, because Young suffered no prejudice, whether Langley erred in failing to object is immaterial.

claim, his "counsel's performance was deficient" and, but for that deficiency, "the result of the proceeding would have been different." Id. at 545-46 (internal quotation marks and citations omitted). Actual prejudice requires a showing that the error "worked to [Young's] actual and substantial damage, infecting his entire trial with error of constitutional dimensions." United States v. Johnson, 278 F.3d 839, 844 (8th Cir. 2002) (quotation marks and citation omitted).

This Court will address the prejudice prong first, as it is dispositive. See Apfel, 97 F.3d at 1076. To determine prejudice, this Court looks to what the Eighth Circuit would have done had the breach of the plea agreement claim been raised. See Becht 403 F.3d at 546. Because this issue was not raised at trial, it would have been reviewed for plain error. See United States v. Cardenas-Celestino, 510 F.3d 830, 833 (8th Cir. 2008); Quiroga v. United States, No. 10-3019-MWB, 2011 WL 2118811, at *8 (N.D. Iowa May 25, 2011). The Court of Appeals would reverse under this standard only if "there is (1) error (2) that is plain and (3) that affects the defendant's substantial rights." Cardenas-Celestino, 510 F.3d at 833; see also United States v. Olano, 507 U.S. 725, 732 (1993) ("There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'"). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 631 (2002) (internal quotation marks and citation omitted). Finally, the evidence offered against the defendant is a consideration when a court reviews for plain error to determine whether the defendant's substantial rights were affected. See United States v. Miner, 108 F.3d 967, 969 (8th Cir. 1997) (refusing to correct an error under plain error because evidence introduced at trial showed the error did not affect the defendant's substantial rights).

27

Even if there was error—a prosecutor breaching a plea agreement—and even if that error was "plain," this error did not affect Young's "substantial rights." An error affects a defendant's substantial rights if the error "affected the outcome of the district court proceedings." Cotton, 535 U.S. at 632 (internal quotation marks and citations omitted); see also Olano, 507 U.S. at 734 ("[I]n most cases . . . the error must have been prejudicial: It must have affected the outcome of the district court proceedings."). Cases addressing this issue often relate to whether one U.S. Attorney may prosecute a defendant for the same crimes that another U.S. Attorney charged, used as leverage to gain a plea agreement and then dismissed pursuant to that plea agreement. See, e.g., United States v. Gebbie, 294 F.3d 540, 550 (3rd Cir. 2002); United States v. Harvey, 791 F.2d 294, 303-04 (4th Cir. 1986). In those cases, prejudice and the impact on the defendant's substantial rights is apparent; but for the breach of the plea agreement, the Government would have not been able to try the defendants for those crimes. See id. Here, however, Young simply challenges admission of a factual basis statement concerning the West Virginia bank robbery case where the underlying facts of the bank robberies were admissible and where the Defendant's attorney chose not to object to its admission for strategic purposes.

Young's substantial rights were not affected by the factual basis statement regarding his West Virginia bank robbery case and that the outcome of the proceeding would not have been different if testimony about the West Virginia bank robberies rather than the factual basis statement had been introduced. Had the factual basis statement been objected to and refused, the facts and circumstances of Young's West Virginia bank robberies would have been admissible under Rule 404(b) of the Federal Rules of Evidence. The West Virginia plea agreement's "Limitation on Immunity" section does not bar introduction of the facts related to the plea

28

agreement. That section states "[n]othing contained in this agreement restricts the use of information obtained by the United States from an independent, legitimate source, separate and apart from any information and testimony provided pursuant to this agreement . . . in prosecuting Mr. Young for any violations of federal or state laws." Doc. 1-8 at 6. The Government would have admitted identity evidence relating to the similarity between Young's bank robberies in West Virginia and the bank robberies in South Dakota. Indeed, the content of the factual basis statement likely was less harmful to Young than the alternative—extended live testimony about Young having committed multiple bank robberies in West Virginia in the same manner as the three bank robberies in South Dakota, and again being captured on surveillance videos doing so. Finally, the evidence that Young committed the three South Dakota bank robberies, which is a consideration in plain error review, was overwhelming. Thus, Young's substantial rights were not affected and he was not prejudiced by the admission of the factual basis statement or by his counsel's failure to object; even if this was error, it did not affect the outcome of the trial. Olano, 507 U.S. at 734. Young's ineffective assistance of appellate counsel claims fail, and he cannot overcome the procedural bar.

## IV. CONCLUSION

For good cause, it is hereby

ORDERED that Young's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, Doc. 1, is denied. It is further

ORDERED that Young's Motion to Pose a Question, Doc. 24, is denied as moot. It is further

ORDERED that Young's motion for Appointment of Counsel, Doc. 25, is denied.

Dated July 9, 2013.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE